**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 17 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

JORGE BRISENO-MENDEZ, a.k.a.
Jorge Brisenio,

      Defendant-Appellant.

_____

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

EMILY SILVA,

      Defendant-Appellant.

_____

No. 96-2145
(District of New Mexico)
(D.C. No. 95-CR-528-3)

No. 96-2172
(District of New Mexico)
(D.C. No. CR-95-528-2)

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

ANGEL JOSE CASTANEDA,

    Defendant-Appellant.

No. 96-2218
(District of New Mexico)
(D.C. No. CR-95-528)

## ORDER AND JUDGMENT[*]

Before **TACHA**, **HOLLOWAY,** and **MURPHY**, Circuit Judges.

A superseding two-count indictment charged Emily Silva, Jorge Briseno-Mendez and Angel Jose Castaneda with (1) conspiracy to possess with intent to distribute more than five kilograms cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846 and 18 U.S.C. § 2, and (2) possession with intent to distribute more than five kilograms cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. All three were tried jointly before a jury. Silva and Briseno-Mendez were convicted on both counts; Castaneda was found guilty on the

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

conspiracy count, but acquitted on the possession count. All three appeal their convictions. Their appeals raise the following issues: (1) whether the district court erred in refusing to grant Briseno-Mendez and Castaneda severance; (2) whether the court violated Silva's and Briseno-Mendez's confrontation rights by prohibiting cross-examination of codefendant Castaneda regarding his criminal history; (3) whether the court erred in admitting evidence against Castaneda which was seized during a search of the car he was driving; (4) whether the court erred in refusing Briseno-Mendez's request for a jury instruction regarding intoxication; (5) whether there was sufficient evidence to sustain Briseno-Mendez's and Castaneda's convictions; and (6) whether the court erred at sentencing by refusing to find that Castaneda was a minimal participant and that his criminal history was exaggerated. This court affirms.

## BACKGROUND

On September 12, 1995 Silva, Briseno-Mendez, and Castaneda were arrested at an immigration checkpoint station in New Mexico after agents found approximately twenty-one kilograms of cocaine hidden in their car.

When the defendants pulled into the checkpoint, Agent Hector Lugo asked whether everyone in the car was a United States citizen. Castaneda, who was driving the vehicle, answered in the affirmative. When Castaneda replied, Agent Lugo noticed that Briseno-Mendez, who was sitting in the front passenger seat,

did not make eye contact with him, so Agent Lugo again inquired into his citizenship. In response, Briseno-Mendez handed Agent Lugo a card from Caesar's Palace. Upon further inquiry, Agent Lugo discovered that Castaneda was not a United States citizen, as he had represented, but rather a resident alien and that Briseno-Mendez was not in the United States legally. Briseno-Mendez was placed under arrest.

Agent Lugo then asked Castaneda for permission to search the vehicle. Castaneda responded, "Go ahead. It's not my car." Castaneda told Agent Lugo that the car belonged to one of his girlfriends.

Agent Lugo signaled Agent Brian May to bring Tessa, a drug sniffing dog, to the car. When the dog reached an open window, she alerted. Agent May then let Tessa inside the car where she specifically alerted to the rear seat. A search of the car revealed a hidden compartment behind the rear seat containing approximately twenty-one kilograms of cocaine, as well as coffee grounds to mask the odor. Agent May testified that the trap door to the hidden compartment was lightly covered by a layer of "Bondo," a filler generally used to repair damage to the body of a vehicle, and that the Bondo was "still soft and somewhat

pliable," an indication that it had been in place for only a day or two. Agent May also testified that the carpet covering the trap door "appeared to be almost new."[2]

Silva and Castaneda were placed under arrest and subsequently questioned by Agent May. Silva told Agent May that they had driven from Bell, California to El Paso, Texas "to party and to just see El Paso" and that they were on their way back to California. The distance between Bell and El Paso is approximately 800 miles. When Agent May asked what they did in El Paso, Silva told him that "once they got to El Paso, they decided not to go out and they just rented a motel room and stayed there the entire time." Silva also told Agent May that Briseno-Mendez and Castaneda left the motel for a short time to fix the car battery, but she did not accompany them.

Castaneda similarly told Agent May that they had driven from Bell to El Paso "just to see El Paso." He reported that they spent most of their time in El Paso at a motel, but said that he and Briseno-Mendez left the motel for a short time to work on the car. Contrary to his earlier statement that the car belonged to one of his girlfriends, Castaneda told Agent May that "Ms. Silva had borrowed the car from a friend of hers."

---

[2]After Castaneda's arrest, Doña Ana County Metro Narcotics Agent Dennis Romero found an upholstery shop business card on his person. Two identical business cards were found in the vehicle.

Doña Ana County Metro Narcotics Agent Dennis Romero also questioned Silva and Castaneda. Silva and Castaneda both told Agent Romero that they had left Bell the evening of September 10th, had driven all night, had arrived in El Paso mid-morning on September 11th, and left El Paso again the afternoon of September 12th. Silva told Agent Romero that once they arrived in El Paso, she stayed in the motel room, while Briseno-Mendez, whom Silva identified as her boyfriend, and Castaneda left to get beer. Castaneda, on the other hand, told Agent Romero that they remained in the motel throughout their stay in El Paso. Silva also told Agent Romero that she had borrowed the car from a friend and that it was her idea to go to El Paso.

After questioning Silva and Castaneda, Agent Romero searched the car. Agent Romero testified that he immediately noticed there were deodorizers in the car and stated that the car had a strong powdery fragrance. In the trunk of the car, Agent Romero found three bags with clothing, but noted that he did not find any toiletries.

At trial, Wendy Farrier testified that she had sold the vehicle the defendants were driving to a person named "Miguel" who was accompanied by two other Mexican men. Miguel paid $1,000 cash for the car. Farrier told the three men that she needed to find the car's title, but they said it was not necessary. A month later, Farrier signed a release of liability at the DMV after she was unable to

-6-

reach the men who had purchased the car. Farrier testified that she was not certain, but Briseno-Mendez "look[ed] familiar, like he was one of the men that was there." Farrier's boyfriend, Steve Siddler, was also present during the sale. Siddler testified that while he could not identify the men's faces, based on age, height, weight, and national origin, Castaneda and Briseno-Mendez fit the description of two of the men who were present during the sale.

Castaneda and Silva both testified on their own behalf. Castaneda testified that he had met Silva about a month and a half before the trip to El Paso. He stated that Silva asked him if he wanted to go on a trip and offered him money to drive her to El Paso. A few days after Silva asked him to drive, Silva's boyfriend, Briseno-Mendez, came over and asked Castaneda if he was ready to leave. Castaneda testified that he grabbed a small bag with clothes; got in a truck that belonged to Silva; waited for Silva's daughter to arrive; followed Silva's daughter, who was driving a Volkswagen, to a house; and then got into the Volkswagen with Silva and Briseno-Mendez and departed. Castaneda stated that they left California in the evening and drove fourteen hours "straight through the night and daytime." He testified that at about 5:00 a.m., he "started slapping the hell out of [his] face because [he] couldn't drive no more."

When they got to El Paso, Castaneda stated that he drove to a cheap motel. Silva gave him money for the motel room and instructed him to pay for a

telephone in the room, which Silva used. Castaneda testified that he left the motel room to eat and then again to go get beer with Briseno-Mendez.

Castaneda testified that the next day, Silva asked him to drive her and gave him instructions. Silva directed Castaneda across the Mexican border to Ciudad Juarez. Castaneda stated that he "panicked because [he] was crossing the border" and became "suspicious . . . the car was stolen or something . . . was going down."

Castaneda testified that during their trip to Mexico, Silva had him drive down the street so she could look for a friend's car. They stopped for a short period and Silva phoned Briseno-Mendez at the motel. Briseno-Mendez told Silva to go over the border and wait. An individual then approached their vehicle and Castaneda was instructed to follow another car. They stopped in front of a restaurant. There were two men present. Silva handed the car key to one of the men. One man said he was going to check the motor. Castaneda went inside the restaurant. Approximately twenty-five minutes later, the two men returned, handed over the key, and helped Castaneda push the car because it was not functioning properly.

Castaneda testified that Silva and he then returned to El Paso, checked out of the motel, and started the trip back to California. At the checkpoint where they were arrested, Castaneda testified that he never claimed he or Briseno-Mendez

were United States citizens, as Agent Lugo had stated. Castaneda further testified that when agents asked if they could search the vehicle, he told them: "Go ahead. I don't got nothing in here, you know." Castaneda denied knowledge of the cocaine.

Silva testified that she met Castaneda through Briseno-Mendez the day before their trip to El Paso, although she had seen him around. Silva stated that the three of them were looking for something different to do and Castaneda suggested driving to El Paso. Silva testified that Castaneda thought he could borrow a car and offered to do the driving. The next day, Castaneda informed Silva and Briseno-Mendez that he had a car and would like to leave that night. That evening, Castaneda, who was driving the borrowed car, followed Silva to her daughter's house. Silva left the truck she was driving at her daughter's house and they departed in the car Castaneda had borrowed.

Silva testified that when they arrived in El Paso, Castaneda paid for a motel room. They rested and then went out to dinner. Later, Briseno-Mendez and Castaneda left for a short period to get beer, but otherwise Silva, Briseno-Mendez and Castaneda remained in the motel room. Silva testified that because they did not have much money, they decided to return to Bell the following day. Silva denied that she and Castaneda crossed the Mexican border.

Silva further testified that when they stopped at the checkpoint on their way back to Bell, Castaneda initially told the agent that they were all United States citizens. Silva also testified that Castaneda told Agent Lugo the car belonged to his girlfriend. Silva testified that she was asked by an agent if the car belonged to friend and answered in the affirmative because she thought the agent was referring to Castaneda, whom she considered a friend. However, Silva also testified that she did not recall telling agents that she had borrowed the car from a friend. On cross-examination, Silva again denied that she had obtained the car and insisted that Castaneda had provided the car. Silva also denied telling Agent Romero that it was her idea to go to El Paso, claiming instead that it was Castaneda's idea. She further denied knowledge of the cocaine.

Briseno-Mendez did not testify.

## SEVERANCE

Castaneda and Briseno-Mendez argue that the district court erred in denying their motions for severance. The decision to grant or deny a motion to sever is within the sound discretion of the trial court and will not be disturbed on appeal absent a showing of abuse of discretion. *See United States v. Rodriguez-Aguirre*, 108 F.3d 1228, 1233 (10th Cir. 1997). Severance should be granted by the district court, pursuant to Rule 14 of the Federal Rules of Criminal Procedure, "only if there is a serious risk that a joint trial would compromise a specific trial

right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993); *accord United States v. Youngpeter*, 986 F.2d 349, 353 (10th Cir. 1993). On appeal, it is not enough for a defendant to show severance would have improved his chances of acquittal; instead, a defendant bears the burden of making a "strong showing" of "real prejudice." *United States v. Dirden*, 38 F.3d 1131, 1140 (10th Cir. 1994) (internal quotations omitted).

Castaneda and Briseno-Mendez argue that the defenses presented at trial were mutually antagonistic. "Severance may be necessary if the defenses are 'so antagonistic that they are mutually exclusive.'" *Dirden*, 38 F.3d at 1141 (quoting *United States v. Esch*, 832 F.2d 531, 538 (10th Cir. 1987)). The mere fact that "defense theories conflict" or that "one defendant is attempting to cast blame on the other," however, is insufficient to warrant a severance. *Id*. "Mutually antagonistic defenses are not prejudicial *per se.*" *Zafiro*, 506 U.S. at 538. Rather, to establish prejudice, "[t]he defenses truly must be mutually exclusive, such that the jury could not believe the core of one defense without discounting entirely the core of the other." *Dirden*, 38 F.3d at 1141; *see also United States v. Linn*, 31 F.3d 987, 992 (10th Cir. 1994).

In this case, all three defendants argue that they did not have knowledge of the drugs in the car. Silva attempted to place the blame for the drugs on

Castaneda, while Castaneda tried to implicate Silva and, by his association with Silva, Briseno-Mendez. Both Castaneda and Briseno-Mendez argue that they should have been granted severance based on the conflict between Castaneda's and Silva's defenses.[3]

During closing argument, counsel for Castaneda argued that "Angel Castaneda was set up by Emily Silva, and the government didn't care." Castaneda's attorney argued that Silva paid him to drive her to El Paso and that during the trip, Silva had him drive her across the border to Mexico, where the jurors could infer she picked up the cocaine. Castaneda's counsel further suggested that Briseno-Mendez knew about and was a part of Silva's plan.

Counsel for Silva, on the other hand, argued that Silva's guilt depended on whether the jurors believed Castaneda's testimony and argued that Castaneda's testimony should not be believed. In closing argument, Silva's counsel accused

---

[3]Castaneda's counsel suggested in closing arguments that Briseno-Mendez was involved in Silva's plan to transport drugs. Briseno-Mendez's closing argument did not attempt to shift blame to Castaneda, as Silva's did, but rather focused on the lack of evidence against Briseno-Mendez and on Briseno-Mendez's intoxication and suggested as an alternative theory that the two individuals who sold the car were involved in a conspiracy to transport drugs. On appeal, however, Briseno-Mendez argues that the conflict between Castaneda's and Silva's defenses prejudiced him. Briseno-Mendez argues that if the jury believed Castaneda, it would have precluded his acquittal, and that if the jury believed Silva, it would have precluded Castaneda's acquittal while requiring Briseno-Mendez's acquittal. Briseno-Mendez further asserts that it is likely the jurors unjustifiably inferred the guilt of all three defendants based on the conflict between Castaneda's and Silva's defenses.

Castaneda of lying, referencing his statement to Agent Lugo that he was a U.S. citizen, his statements regarding the source of the car, and his testimony about the trip to Mexico. Silva's counsel further suggested that Castaneda knew about the cocaine, was being paid to transport it, and used Silva and her boyfriend as cover.

While Castaneda and Silva were clearly attempting to shift blame for the cocaine, their defenses were not so inconsistent that to accept the core of one defense the jury had to discount entirely the other. In essence, both Castaneda and Silva were arguing they had no knowledge of the drugs. While each suggested the other's involvement, neither directly implicated the other. Silva, for instance, testified that the trip to El Paso was Castaneda's idea and that he borrowed the car, but she did not testify that Castaneda knew about the cocaine or that he was otherwise engaged in criminal activity.

Castaneda's testimony, if believed, was slightly more damaging toward Silva. He not only testified that the trip was Silva's idea and that she paid him to drive her to El Paso, but he also testified that Silva had made calls from the hotel room and that she had instructed him to drive to Mexico, where they left the car for a short time with two men. Still, Castaneda did not testify that Silva knew about the cocaine or that cocaine was actually placed in the car during their stop. Nor did Castaneda directly implicate Briseno-Mendez.

-13-

Because Castaneda's and Silva's testimony was inconsistent, it was not possible for a reasonable juror to fully believe both Castaneda and Silva. A juror, however, could believe the core of both of their defenses, namely that they did not have knowledge of the cocaine. Acquittal of Silva therefore did not preclude acquittal of Castaneda, nor did acquittal of Castaneda preclude acquittal of Silva and Briseno-Mendez. Mere finger pointing by a codefendant is insufficient to warrant severance. *See Zafiro*, 506 U.S. at 539-41 (rejecting petitioner's argument that severance must be granted when "two defendants both claim they are innocent and each accuses the other of the crime"); *Linn*, 31 F.3d at 992 (holding severance not warranted when defendants argued their co-defendants committed arson and that they had nothing to do with the fire).

Castaneda and Briseno-Mendez further argue that any prejudice resulting from the joinder was enhanced by differing degrees of culpability among the three co-defendants.[4] "The mere fact that one co-defendant is less culpable than the remaining co-defendants is not alone sufficient grounds to establish a trial court abused its discretion in denying a severance." *Youngpeter*, 986 F.2d at 353; *accord United States v. Williams*, 45 F.3d 1481, 1484 (10th Cir. 1995). In this

---

[4]Briseno-Mendez also argues that the district court's failure to grant him severance resulted in a denial of his Sixth Amendment confrontation rights because of the limitations placed on his cross-examination of co-defendant Castaneda. As discussed below, the limitations placed on the cross-examination of Castaneda did not violate Briseno-Mendez's confrontation rights.

-14-

case, the differing degrees of culpability did not compromise a specific trial right of either Castaneda or Briseno-Mendez, nor did it prevent the jurors from making reliable judgments about guilt or innocence. *See Youngpeter*, 986 F.2d at 353. This case was not so factually complex as to limit the jury's ability to separate the evidence against each defendant, nor was there such a dramatic difference in the strength of the government's cases against co-defendants that spillover was likely. *Cf. Zafiro*, 506 U.S. at 539 (noting that in complex cases, "markedly different degrees of culpability" among co-defendants heightens the risk that prejudice will result from joint trial); *Linn*, 31 F.3d at 992-93 (holding in "simple conspiracy case involving a few actors and a straightforward set of events . . . . [t]he concerns justifying severance based upon differing degrees of culpability are simply not present").

Finally, the district court properly instructed the jury that it must find guilt beyond a reasonable doubt and that "[t]he case of each defendant and the evidence pertaining to that defendant should be considered separately and individually. The fact that you may find one of the defendants guilty or not guilty should not control your verdict as to any other defendant." Further, the jurors were instructed that they "may not infer that the defendant was guilty of participating in criminal conduct merely from the fact that he associated with other people who were guilty of wrongdoing" and that "mere presence at the

scene of a crime and knowledge that the crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted the crime unless [they] find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator." These limiting instructions sufficed to cure any possibility that the defendants were prejudiced by the joint trial. *See Zafiro*, 506 U.S. at 540-41; *United States v. Emmons*, 24 F.3d 1210, 1219 (10th Cir. 1994).

Castaneda and Briseno-Mendez have failed to demonstrate that they were prejudice by the joint trial. The district court therefore did not abuse its discretion in denying Castaneda's and Briseno-Mendez's motions for severance.

## CONFRONTATION RIGHTS

Silva and Briseno-Mendez claim the district court violated their Sixth Amendment right to confrontation by prohibiting cross-examination of co-defendant Castaneda regarding his prior arrests and convictions on narcotics charges after he testified that he had no knowledge of the drugs or why he and

Silva traveled to Juarez.[5]  They argue that this limitation denied them the opportunity to effectively attack Castaneda's credibility and truthfulness.

The ultimate question of whether improper restrictions on cross-examination were so severe as to constitute a violation of a defendant's confrontation rights is reviewed *de novo*.  *See United States v. Pedraza*, 27 F.3d 1515, 1529 (10th Cir. 1994).  Evidentiary matters and the extent of cross-examination with respect to appropriate subjects, however, are within the sound discretion of the trial court.  *See United States v. Ruiz-Castro*, 92 F.3d 1519, 1528 (10th Cir. 1996).  This court has therefore held that a district court decision excluding cross-examination regarding a witness' prior criminal record is reviewed for abuse of discretion and "should be set aside on appeal only if the trial court's decision reflects an arbitrary, capricious, whimsical, or manifestly unreasonable judgment."  *Id.* (internal quotations omitted).

Silva and Briseno-Mendez repeatedly argued, both during trial and in their motion for a new trial, that Castaneda's prior record should be admitted pursuant to Rules 405 and 406 of the Federal Rules of Evidence and that the district court's

---

[5]Before trial, the United States filed a Notice of Intention to Use Evidence of Other Crimes or Bad Acts as to defendant Castaneda pursuant to Rule 404(b) of the Federal Rules of Evidence.  Castaneda subsequently sought a pre-trial ruling excluding the introduction of his prior arrests and convictions under Rules 404(b) and 609 of the Federal Rules of Evidence.  Concluding that the prejudicial effect of Castaneda's prior convictions outweighed their probative value, the district court ordered exclusion of the prior convictions under both rules.

failure to admit the evidence impermissibly infringed on their confrontation rights. Neither evidentiary rule supports the admissibility of Castaneda's prior convictions and arrests.

Rule 405 permits specific instances of a person's conduct to be offered as character evidence when "character or a trait of character of a person is an essential element of a charge, claim, or defense." Fed. R. Evid. 405(b). "The rule deals only with allowable methods of proving character, not with the admissibility of character evidence, which is covered in Rule 404." Fed. R. Evid. 405 advisory committee's note. In this case, Silva and Briseno-Mendez have not demonstrated that Castaneda's character was an essential element of the charges or defense, nor have they addressed Rule 404's general prohibition on using character evidence to prove action in conformity therewith. *See* Fed. R. Evid. 404(a). Evidence of Castaneda's prior criminal acts was therefore not admissible under Rule 405.

Rule 406, which allows evidence of habit or routine practice to prove conduct is in conformity therewith, is similarly inapplicable. *See* Fed. R. Evid. 406. Silva and Briseno-Mendez argued at trial and in their motion for a new trial that Castaneda's seven page "rap sheet" dealing with narcotics convictions and arrests was evidence of a habit. The advisory committee notes to Rule 406 of the Federal Rules of Evidence, however, define "habit" as a "person's regular

-18-

practice of meeting a particular kind of situation with a specific type of conduct, such as the habit of going down a particular stairway two stairs at a time, or of giving the hand-signal for a left turn . . . . The doing of the habitual acts may become semi-automatic." Fed. R. Evid. 406 advisory committee's note. Nothing reflected in Castaneda's rap sheet constitutes a habit for purposes of Rule 406.

The district court therefore did not err in denying the admission of Castaneda's prior convictions on the evidentiary bases argued by Silva and Briseno-Mendez during the trial. Nor did the district court abuse its discretion in determining that the prejudicial effect of Castaneda's prior convictions outweighed their probative value. The risk of the jury improperly inferring guilt from Castaneda's prior drug offenses was great. The probative value of the prior offenses, however, was limited. Castaneda's past criminal history did not directly reflect on his claim that he had no knowledge of the drugs in this instance, nor did Silva or Briseno-Mendez argue his past crimes were the type that involved dishonesty or false statements. The trial court's decision to exclude Castaneda's prior offenses therefore was not arbitrary, capricious, whimsical, or manifestly unreasonable.

Nor were the limitations placed on the cross-examination of Castaneda so great as to amount to a violation of Silva's and Briseno-Mendez's confrontation rights. While the Sixth Amendment "guarantees an *opportunity* for effective

cross-examination," it does not guarantee a "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (emphasis in original); *accord Pedraza*, 27 F.3d at 1529. "Our duty in reviewing the adequacy of the cross-examination is to determine whether the jury had sufficient information to make a discriminating appraisal of the witness' motives and bias." *United States v. Sinclair*, 109 F.3d 1527, 1537 (10th Cir. 1997) (internal quotations omitted).

Silva and Briseno-Mendez had ample opportunity to attack Castaneda's credibility. It was readily apparent that Castaneda, as a co-defendant, had motive to shift blame from himself to Silva and Briseno-Mendez. Castaneda's testimony at trial was inconsistent with what checkpoint agents testified he told them during the stop. His testimony regarding the trip to Mexico was internally inconsistent[6] and not corroborated by a 72-hour lane check conducted by agents to determine whether the vehicle had crossed the United States-Mexico border. The jurors were thus presented with sufficient information to assess Castaneda's motives and biases. The exclusion of Castaneda's prior convictions and arrests therefore did not violate Silva's and Briseno-Mendez's confrontation rights.

---

[6]On direct examination, Castaneda testified that he would not know the two men who were present when he and Silva exited the car in Mexico, "even if [he] look[ed] at them in a picture." On cross-examination, however, Castaneda testified that if he saw a picture, he would "know who they are."

-20-

## SEARCH

Castaneda argues the district court erred in denying his motion to supress. In reviewing a district court's ruling on a motion to suppress, this court accepts the district court's factual findings unless they are clearly erroneous and views the evidence in the light most favorable to the district court's findings. *See United States v. Toro-Pelaez*, 107 F.3d 819, 824 (10th Cir. 1997). The ultimate determination of whether the challenged conduct is reasonable under the Fourth Amendment, however, is a question of law which we review *de novo*. *See id*.

Castaneda asserts that his continued detention at the immigration checkpoint, after agents determined he was legally in the United States, was unlawful. Castaneda argues that Agent Lugo's request to search the car, which occurred after Lugo determined Castaneda was a resident alien, was "outside the scope of permissible routine questioning and not based upon a showing of reasonable suspicion." Castaneda further contends that any consent he gave to search the vehicle was not voluntary, knowing, or intelligent. He concludes that because his continued detention and the subsequent search were not justified by reasonable suspicion, the district court erred in not granting his motion to supress.[7]

_____

[7]The government argues that Castaneda lacks standing to challenge the search of the car because he has not demonstrated he had any legitimate expectation of privacy in the car. The government notes that Castaneda

At fixed checkpoints, border patrol agents may briefly detain and question a person without any individualized suspicion that the person is engaged in criminal activity. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 562 (1976); *United States v. Massie*, 65 F.3d 843, 847 (10th Cir. 1995). The Fourth Amendment protects an individual's liberty interests at fixed checkpoints by limiting the scope of the stop. *See Martinez-Fuerte*, 428 U.S. at 566-67; *United States v. Rascon-Ortiz*, 994 F.2d 749, 752 (10th Cir. 1993). "A routine checkpoint stop must be brief and unintrusive." *Rascon-Ortiz*, 994 F.2d at 752.

During a routine fixed-checkpoint stop, agents may inquire into an individual's citizenship or immigration status and request documentation; may make a cursory visual inspection of the vehicle; and may briefly question an individual "concerning such things as vehicle ownership, cargo, destination, and travel plans," so long as such questions are "reasonably related to the agent's duty to prevent the unauthorized entry of individuals into this country and to prevent the smuggling of contraband." *Id.*; *accord Massie*, 65 F.3d at 847-48. In addition, if an agent observes "suspicious circumstances" during a routine stop, "the agent may briefly question the motorist concerning those suspicions and ask

consistently claimed the car was not his. Even when a defendant lacks standing to directly challenge the search of a vehicle, the defendant may still seek suppression of evidence discovered in the vehicle if the evidence is the fruit of the defendants' unlawful detention. *See United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996).

the motorist to explain."[8] *Rascon-Ortiz*, 994 F.2d at 753; *accord Massie*, 65 F.3d at 848.

Any detention beyond the scope of a routine checkpoint stop, however, must be based on reasonable suspicion, probable cause, or consent. *See Martinez-Fuerte*, 428 U.S. at 567; *Rascon-Ortiz*, 994 F.2d at 753. While a visual inspection of a vehicle is permissible as part of a routine checkpoint stop, Agents may not search vehicles stopped at a checkpoint in the absence of probable cause or consent. *See Rascon-Ortiz*, 994 F.2d at 754.

In the instant case, the district court found that at the checkpoint Castaneda originally claimed that he, Briseno-Mendez, and Silva were United States citizens. Upon subsequent questioning, Castaneda admitted that he was not a United States citizen, but a resident alien. This prompted further questioning, which resulted in the discovery that Briseno-Mendez was in the country illegally. The district court further found that "[w]hile the defendant Castaneda was out of

---

[8]While there is no single definition of "suspicious circumstances," this court has held that suspicious circumstances need not meet the more rigid "reasonable suspicion" standard. *See United States v. Massie*, 65 F.3d 843, 848 (10th Cir. 1995); *United States v. Rascon-Ortiz*, 994 F.2d 749, 753 n.6 (10th Cir. 1993); *United States v. Sanders*, 937 F.2d 1495, 1500 (10th Cir. 1991). In determining whether suspicious circumstances exist, this court applies "'a common sense view of the totality of the circumstances.'" *Massie*, 65 F.3d at 848 (quoting *Sanders*, 937 F.2d at 1501). "[S]ome deference is properly given to border patrol agents who . . . are specifically trained to look for indicia of crime, with an emphasis on immigration and customs laws." *Sanders*, 937 F.2d at 1500.

the vehicle, within less than five minutes of having arrived at the check stop, he was asked and consented to a search of the vehicle." These factual findings, which are supported by Agents Lugo's testimony during the hearing on the motion to suppress, are not clearly erroneous.

The questions concerning the citizenship status of the defendants were clearly within the scope of permissible, routine questioning during a checkpoint stop. The matter Castaneda challenges as beyond the scope of routine questioning is the request for consent to search the car, which occurred after agents had satisfied their concerns about his immigration status. The request for consent to search the car was permissible. The request was directly related to agents' duty to prevent the smuggling of contraband. The fact that the defendants were initially referred to a secondary inspection area because of concerns about their citizenship status does not prevent agents from investigating other suspicious circumstances. *See Massie*, 65 F.3d at 848. In this case, Castaneda's misrepresentation of his and Briseno-Mendez's citizenship status created suspicious circumstances; the brief questioning that occurred and the request to search the vehicle were well within the permissible scope of questioning when suspicious circumstances are observed during a routine stop.

Castaneda also challenges the voluntariness of his consent. "Consent to search is voluntary if it is not the product of duress or coercion, express or

implied." *United States v. Espinosa*, 782 F.2d 888, 892 (10th Cir. 1986) (internal quotations omitted). The "voluntariness" of consent is a factual question to be determined from the totality of the circumstances. *See id*.

Castaneda argues his consent was not voluntary, knowing, or intelligent because, at the time Agent Lugo requested his permission to search the car, Castaneda had already been stopped and detained; Briseno-Mendez had already been arrested; Agent Lugo was wearing sunglasses and had both a firearm on his left side and a side handle baton; Agent Lugo was accompanied by three other agents, all of whom were dressed in green uniforms and carrying sidearms and side handle batons; and Castaneda was not informed of his right to decline consent. Castaneda, however, does not allege that the agents threatened him. At the hearing on the motion to supress, Agent Lugo testified that when he requested permission to inspect the vehicle more closely, Castaneda replied, "Go ahead. This is not my car." At trial, Castaneda himself testified that when an agent asked for his permission to search the car, he told the agent, "Go ahead. I don't got nothing in here, you know." The mere presence of uniformed agents with sidearms and side handle batons did not render Castaneda's consent involuntary. Nor does the evidence indicate that threats, promises, or force were used to obtain the consent. *See id*. The district court's finding that Castaneda consented to the search is therefore not clearly erroneous.

Further, this court has held that when defendants are lawfully detained, consent for a dog sniff is not required. *See Massie*, 65 F.3d at 849 (holding consent not required for dog sniff during checkpoint stop when defendants were lawfully detained based on suspicious circumstances). Even in the absence of Castaneda's consent, therefore, the dog sniff was permissible as part of a brief investigation into suspicious circumstances observed during the checkpoint stop. *See id*. Once the dog alerted, agents had probable cause to search the car, making Castaneda's consent unnecessary for the search of the car's interior and his continued detention during the search. *See id*.

The district court therefore did not err in denying Castaneda's motion to suppress.

## INTOXICATION INSTRUCTION

Briseno-Mendez argues the district court erred by failing to instruct the jury that voluntary intoxication may negate the requisite specific intent[9] for a conspiracy conviction.[10] "A defendant is entitled to correct instructions on

---

[9]Conspiracy to distribute a controlled substance is a specific intent crime. *See United States v. Merriweather*, 78 F.3d 1070, 1078 (6th Cir. 1996). A defendant is not guilty of a specific intent offense if voluntary intoxication prevented the defendant from forming the requisite specific intent. *See United States v. Sands*, 968 F.2d 1058, 1064 (10th Cir. 1992); *see also United States v. Boyles*, 57 F.3d 535, 541 (7th Cir. 1995); *United States v. Echeverry*, 759 F.2d 1451, 1454 (9th Cir. 1985).

[10]Jurors were given a voluntary intoxication instruction as to the possession with intent to distribute count.

defenses supported by sufficient evidence for a jury to find in [the] defendant's favor." *United States v. Davis*, 953 F.2d 1482, 1492 (10th Cir. 1992); *see also United States v. Simmonds*, 931 F.2d 685, 688-89 (10th Cir. 1991); *United States v. Prazak*, 623 F.2d 152, 154 (10th Cir. 1980). District courts, however, have substantial discretion in formulating jury instructions; this court's review is confined to determining whether the instructions, considered as a whole, sufficiently cover the issues presented by the evidence and constitute correct statements of the law. *See Davis*, 953 F.2d at 1492.

The evidence in the record is insufficient to necessitate an intoxication instruction on the conspiracy count. To be entitled to an intoxication instruction there must be evidence that a defendant's intoxication prevented him from forming the requisite intent required for a conviction. *See United States v. Boyles*, 57 F.3d 535, 542 (7th Cir. 1995).

> "A bald statement that the defendant had been drinking or was drunk is insufficient--insufficient not because it falls short of the quantum of evidence necessary, but because it is not evidence of the right thing. In order to merit an intoxication instruction . . . the defendant must point to some evidence of mental impairment due to the consumption of intoxicants sufficient to negate the existence of the [specific] intent[.]"

*Id*. (alterations and ellipses in original) (quoting *State v. Strege*, 343 N.W.2d 100, 105 (Wis. 1984)).

There is evidence that Briseno-Mendez drank during the trip and may have been either intoxicated or hungover at the time of his arrest. There is testimony that Briseno-Mendez and Castaneda drank beer the evening before they were arrested, as well as the day the trip was first discussed. Silva testified that Briseno-Mendez was a "drinker" and that he had a hangover at the checkpoint. At the time of his arrest, agents asked Briseno-Mendez only for biographical information, rather than conducting a full interview, due at least in part to agents' concern that he was intoxicated. Agent Romero testified that he smelled a strong odor of alcohol on Briseno-Mendez and that Briseno-Mendez told him that he had consumed approximately two quarts of beer during the drive from El Paso to the checkpoint. Agent Romero, however, stated that he could not tell whether or not Briseno-Mendez was intoxicated or merely impaired. Agent Lugo described Briseno-Mendez as glassy-eyed. Agent Lugo, however, testified Briseno-Mendez appeared to understand his questions, did not have problems communicating, and did not have difficulty walking. Agent May did not recall smelling alcohol on Briseno-Mendez and testified that Briseno-Mendez had no problem answering biographical questions.

While this evidence was sufficient to show that Briseno-Mendez was drinking, it does not warrant an intoxication instruction. The alleged conspiracy extended from September 10, 1995 to September 12, 1995. During that time

period, the defendants drove from Bell to El Paso, spent a night in El Paso, and began the return trip to California. Contrary to Briseno-Mendez's contention on appeal, the evidence does not show Briseno-Mendez was drinking "the entire time," much less that he was so intoxicated during the three-day period as to be unable to form the requisite intent for a conspiracy conviction. At best, the evidence shows Briseno-Mendez drank the evening before his arrest and was either drunk or had a hangover at the time of his arrest. Even assuming that Briseno-Mendez had been drinking the previous evening and was drunk at the time he was arrested, a voluntary intoxication instruction was not required because there was no evidence his intoxication created a mental impairment sufficient to negate the existence of specific intent. *See id.* (holding voluntary intoxication instruction not required when defendant, although inebriated at time of offense, failed to present evidence that his degree of inebriation made him incapable of forming requisite intent or resulted in suspension of his power to reason); *see also Prazak*, 623 F.2d at 154 ("[T]here need be no instruction on a defendant's theory of defense where there is no support therefor in the evidence or the law."). The district court therefore did not err in refusing Briseno-Mendez's request for a voluntary intoxication instruction on the conspiracy count.

## SUFFICIENCY OF EVIDENCE

Briseno-Mendez contends that the evidence was insufficient to sustain his conviction on both the possession and conspiracy counts and Castaneda challenges the sufficiency of the evidence to support his conspiracy conviction. In determining the sufficiency of the evidence, this court reviews the record *de novo* and "ask[s] only whether, taking the evidence--both direct and circumstantial, together with the reasonable inferences to be drawn therefrom--in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. Owens*, 70 F.3d 1118, 1126 (10th Cir. 1995) (internal quotations omitted). This court will not reverse a jury's guilty verdict for insufficient evidence unless "no reasonable juror could have reached the disputed verdict." *Id.* (internal quotations omitted).

To obtain a conviction for possession of narcotics with intent to distribute, the government must establish beyond a reasonable doubt that the defendant (1) knowingly possessed the illegal drug and (2) had the specific intent to distribute it. *See United States v. Carter*, 130 F.3d 1432, 1440 (10th Cir. 1997). Possession may be actual or constructive. *See id.* at 1441. Constructive possession is established by evidence, either direct or circumstantial, that the defendant "knowingly holds the power and ability to exercise dominion and

-30-

control over the property." *Id.* Constructive possession may be joint among several individuals. *See id.*

A conviction for conspiracy, in violation of 21 U.S.C. § 846, requires the jury to find, beyond a reasonable doubt, "(1) an agreement with another person to violate the law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement, and (4) interdependence among the alleged conspirators." *Id.* at 1439. An agreement constituting a conspiracy may be inferred "'from the acts of the parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose.'" *Id.* (quoting *United States v. Johnson*, 42 F.3d 1312, 1319 (10th Cir. 1994)). Mere association with coconspirators or mere proximity to illegal activity, while material and probative, are insufficient to support a conspiracy conviction. *See United States v. Ivy*, 83 F.3d 1266, 1285 (10th Cir. 1996); *United States v. Jones*, 44 F.3d 860, 865-66 (10th Cir. 1995); *United States v. Riggins*, 15 F.3d 992, 994 (10th Cir. 1994).

Additionally, a defendant who aids and abets the commission of a crime is punishable as a principle. *See* 18 U.S.C. § 2(a). In order to establish guilt as an aider and abetter, the government must show that the defendant willfully associated himself with the criminal venture and sought to make the venture

succeed through some act of his own.  *See United States v. Leos-Quijada*, 107 F.3d 786, 794 (10th Cir. 1997).

**A.  Sufficiency of Evidence to Convict Briseno-Mendez**

Briseno-Mendez maintains that the only evidence presented by the government to establish he was in possession of the cocaine was his presence in the vehicle.  Mere presence in a vehicle containing narcotics is insufficient to support a conviction for either possession of narcotics or conspiracy to possess narcotics.  *See Jones*, 44 F.3d at 865-866, 869-70 (holding defendant's presence in vehicle containing cocaine coupled with evidence that she suspected illegal activity was insufficient to support possession and conspiracy convictions); *see also United States v. Reece*, 86 F.3d 994, 996-97 (10th Cir. 1996) (holding driver's dominion over vehicle in which contraband was found and proximity to contraband was insufficient to support possession conviction when there was more than one person who could be in possession of contraband); *Riggins*, 15 F.3d at 994 (holding that even if defendant knew her mother and sister were hiding drugs in van, defendant's presence in van was insufficient to support conspiracy conviction).

In the instant case, however, the evidence showed more than Briseno-Mendez's mere presence in the vehicle.  Briseno-Mendez accompanied Silva and Castaneda on a 800-mile trip from Bell to El Paso.  The three defendants stayed in

El Paso only one night before beginning the return trip to Bell. Agents found no toiletries in the car which would be consistent with a pleasure trip and defendants did not see any sights during their stay in El Paso, despite Castaneda's and Silva's claim that they just wanted to see what El Paso was like. The Bondo covering the trap door to the compartment where the cocaine was found was still fresh, indicating that the cocaine had been in the vehicle only a day or two, a time period which coincides with defendants' three-day trip.

While the modifications to the car were not necessarily apparent from the outside, Agent May testified that the modifications were "very evident" from inside the car. Agents testified that the carpet covering the trap door "appeared to be almost new." Upholstery shop business cards and a toilet bowl deodorizer were recovered from the floorboard of the passenger sear where Briseno-Mendez was sitting and the car was filled with the masking odor of coffee and deodorizers. Jurors could thus infer Briseno-Mendez was aware of the cocaine.

Additionally, Wendy Farrier, the previous owner of the vehicle in which the cocaine was found, testified that while she was not certain, Briseno-Mendez looked "familiar," like one of the two men who was present during the purchase the vehicle. Farrier's boyfriend, who was present during the sale, was not able to positively identify Briseno-Mendez, but testified that Briseno-Mendez's and Castaneda's age, height, weight, and national origin fit the description of the two

men who had accompanied the purchaser of the vehicle. Finally, while Castaneda's testimony was internally inconsistent, Castaneda testified on direct examination that on the day he and Silva were driving around near the border, Silva called Briseno-Mendez, who had stayed at the motel, and Briseno-Mendez instructed Silva to go into Mexico.[11] Castaneda also testified that either he or Briseno-Mendez were behind the wheel during the drive to El Paso.

This evidence is sufficient to support an inference that Briseno-Mendez had joint constructive possession of the cocaine found in the vehicle or, in the alternative, that Briseno-Mendez willfully joined the criminal venture and took actions to aid the possession of the cocaine.

Briseno-Mendez also challenges the sufficiency of evidence to support his conspiracy conviction. He argues that the only evidence of his participation in the conspiracy was Castaneda's testimony that Silva made a phone call to him and that he instructed Silva and Castaneda to go across the border to Mexico. Briseno-Mendez contends that this testimony is insufficient because it is inconsistent with other testimony by Castaneda and is it not supported by any of the other evidence presented at trial. Additionally, Briseno-Mendez argues that

---

[11]During cross examination, Castaneda testified that Briseno-Mendez did not direct him to cross the border and that Briseno-Mendez did not know how to talk on the phone. In reviewing the sufficiency of evidence, however, this court accepts the jury's resolution of conflicting evidence and its credibility assessments. *See United States v. Owens*, 70 F.3d 1118, 1126 (10th Cir. 1995).

because his status as an illegal alien ultimately led to the demise of the plan, interdependence is not present. These arguments lack merit.

The three defendants traveled 800 miles from Bell to El Paso, spent only one night in El Paso before beginning the return trip to Bell, and were arrested when agents found cocaine in a freshly sealed hidden compartment of their car. This evidence is sufficient to support an inference that Briseno-Mendez, Silva, and Castaneda agreed to possess cocaine with intent to distribute. The government introduced evidence that the alterations to the vehicle were "very evident" from inside the car. This evidence, along with Briseno-Mendez's presence during the highly suspicious three-day trip, is sufficient to support the conclusion that Briseno-Mendez had knowledge of the essential objectives of the conspiracy.

Briseno-Mendez's knowing and voluntary involvement could be inferred from his participation in the three-day trip to El Paso. The nature of the trip was such that jurors could reasonably infer the sole purpose of the trip was to acquire cocaine and that Briseno-Mendez's involvement in the trip was thus evidence of more than mere proximity to illegal activity. Additionally, jurors could infer Briseno-Mendez's participation in the conspiracy from evidence that he was present when the car was purchased and from Castaneda's testimony that Briseno-Mendez instructed Silva to go to Mexico. While Briseno-Mendez argues that this

evidence is not credible, when viewed in the light most favorable to the government and in conjunction with the other evidence presented at trial, it is sufficient to support a finding that Briseno-Mendez was knowingly and voluntarily involved in the conspiracy.

Finally, the evidence is sufficient to support an inference that the coconspirators were interdependent. This court rejects Briseno-Mendez's contention that there was no interdependence because his status as an illegal alien led to the conspiracy's demise. There is no evidence that the defendants knew they would pass through an immigration checkpoint. Furthermore, even if the defendants had known about the checkpoint, there is no evidence that they thought they would have problems getting through it. Jurors could infer from Castaneda's initial lie about Briseno-Mendez's citizenship status and Briseno-Mendez's silence that the two were working together to bluff their way through the checkpoint.

There is thus sufficient evidence to sustain Briseno-Mendez's possession and conspiracy convictions.

**B. Sufficiency of Evidence to Convict Castaneda**

Castaneda also challenges the sufficiency of evidence supporting his conspiracy conviction. He argues that because he was acquitted on the possession count, his conviction for conspiracy "must be reversed as it was essential to the

conviction for conspiracy that Castaneda possess the cocaine." He further contends that the only evidence presented by the government to support his conviction was his presence in the vehicle containing cocaine.

This court need not address Castaneda's argument that his conviction for conspiracy was inconsistent with his acquittal on the possession count. "Consistency in the verdict is not necessary." *Dunn v. United States*, 284 U.S. 390, 393 (1932); *see also United States v. Powell*, 469 U.S. 57, 62-64 (1984) (reaffirming rule established by *Dunn*); *United States v. Jaynes*, 75 F.3d 1493, 1508-09 (10th Cir. 1996) (upholding conspiracy conviction despite defendant's acquittal of aiding and abetting substantive offenses). This court's review is thus limited to determining whether there was sufficient evidence to support

Castaneda's conspiracy conviction.[12]  *See Powell*, 469 US. at 67; *Jaynes*, 75 F.3d at 1509.

Contrary to Castaneda's assertions, there was ample evidence to support his conviction.  Much of the evidence supporting Briseno-Mendez's conviction also supports Castaneda's conviction.  Like Briseno-Mendez, Castaneda was a participant in a highly suspicious three-day trip.  From evidence that the Bondo was still fresh, jurors could infer that the cocaine was placed in the vehicle during the trip.  As discussed above, the evidence that the modifications to the car were apparent from the inside is sufficient to support an inference that the passengers in the vehicle knew the cocaine was present.  Furthermore, Farrier's boyfriend testified that Castaneda and Briseno-Mendez fit the description of two of the persons who were present when the vehicle was purchased.

---

[12]In a footnote of his brief, Castaneda argues that no factual scenario would support the inconsistent verdicts.  He contends that the jurors did not believe he had knowledge of the cocaine and that they misunderstood the conspiracy instruction.  He therefore requests this court grant him an opportunity to supplement the record and remand the case for an evidentiary hearing, including an examination of the jurors.  In *United States v. Powell*, 469 U.S. 57 (1984), the Supreme Court rejected as "imprudent and unworkable, a rule that would allow defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them."  *Id*. at 66.  The Court noted that "with few exceptions, once the jury has heard the evidence and the case has been submitted, the litigants must accept the jury's collective judgment.  Courts have always resisted inquiring into a jury's thought processes; through this deference the jury brings to the criminal process . . . an element of needed finality."  *Id*. at 67 (internal citations omitted).  This court therefore denies Castaneda's request for an evidentiary hearing.

In addition, checkpoint agents testified that Castaneda lied about his and Briseno-Mendez's citizenship status; that Castaneda originally claimed he had borrowed the car from one of his girlfriends and changed his story after cocaine was found; and that Castaneda told them he had traveled from Bell to El Paso, spending only one night in El Paso, just to get away from Bell and to see what El Paso was like. At trial, however, Castaneda testified to a different version of events. He claimed that the car had come from Silva's daughter; that he drove all night, completely exhausted, because Silva had offered him an undisclosed amount of money; and that he never lied about his or Briseno-Mendez's citizenship status. Additionally, there were discrepancies between what Castaneda told agents he did while in El Paso and his own testimony as to what he did during the trip. Significantly, Castaneda claimed for the first time at trial that he and Silva entered Mexico. His testimony regarding the alleged trip to Mexico was not supported by a 72-hour lane check and was internally inconsistent.

The above evidence is sufficient to support a finding that Castaneda agreed with Silva and Briseno-Mendez to possess cocaine, that Castaneda had knowledge of the essential objectives of the conspiracy, that he voluntarily participated in the conspiracy, and that the coconspirators were interdependent. Viewed in the light most favorable to the government, the evidence supports an inference that Castaneda acquired the vehicle which was used to transport the cocaine, either

borrowing it from a friend or helping to purchase it. There is also evidence that the modifications to the vehicle were apparent from inside the car; jurors could thus infer Castaneda had knowledge of the cocaine. Castaneda did most, if not all, of the driving and the explanation he offered for the 800-mile trip lacked credibility. Castaneda's actions in acquiring the car, driving between Bell and El Paso, and trying to bluff defendants' way through the checkpoint helped further the defendants' common goal of possessing cocaine with the intent to distribute. There was thus sufficient evidence to support Castaneda's conspiracy conviction.

## SENTENCING GUIDELINES

### A. Minimal Participant

Castaneda contends the district court erred in failing to find that he was a "minimal participant" in the conspiracy. He argues that by acquitting him of possession with intent to distribute cocaine, the jury determined that he played a minimal role in the conspiracy. Section 3B1.2 of the Sentencing Guidelines provides a four-level decrease in a defendant's offense level if the court finds the defendant was a "minimal participant" in the criminal activity, a two-level decrease if it finds the defendant was a "minor participant," and a three-level decrease if it finds the defendant was more than a minimal participant but less than a minor participant. *See* U.S.S.G. § 3B1.2. In determining whether a defendant is entitled to a reduction under § 3B1.2, courts examine the defendant's

culpability relative to that of other participants in the offense. *See* U.S.S.G.

§ 3B1.2 application notes 1, 3; *see also United States v. Williamson*, 53 F.3d

1500, 1524 (10th Cir. 1995).

Castaneda bears the burden of establishing by a preponderance of the

evidence that he is entitled to an offense level reduction under § 3B1.2. *See*

*Williamson*, 53 F.3d at 1523. A district court's decision that a defendant is not a

minor or minimal participant in an offense is a factual finding which this court

reviews only for clear error. *See id.* A factual finding is clearly erroneous if it is

"without factual support in the record, or if after reviewing the evidence we are

left with the definite and firm conviction that a mistake has been made." *Id.*

(internal quotations omitted).

Based on our review of the record, this court cannot say the district court's

finding that Castaneda was neither a minimal nor minor participant in the

conspiracy was clearly erroneous. Castaneda's acquittal on the possession count

does not require this court to hold otherwise. Jurors were asked to determine

whether or not Castaneda was guilty of the offenses, not to determine his relative

role in each offense. As a consequence, Castaneda's acquittal on the possession

charge does not necessarily reflect upon his relative participation in the

conspiracy. Nor does Castaneda's denial of culpability compel a finding that he

was either a minor or minimal participant. As discussed above, there is

substantial evidence that Castaneda was a knowing participant in the conspiracy and played a critical role in transporting a large amount of cocaine.

Finally, even if the district court had found that Castaneda was recruited by Silva and Briseno-Mendez to act as a courier, it would not be required to grant him an offense level reduction under § 3B1.2. While commentary to § 3B1.2 suggests that a downward adjustment may be appropriate "where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs," U.S.S.G. § 3B1.2 application note 2, this court has firmly rejected the argument that a defendant's status as a courier alone compels an offense level reduction under § 3B1.2. *See United States v. Ballard*, 16 F.3d 1110, 1115 (10th Cir. 1994) ("[T]his court has refused to adopt per se rule that couriers are minor or minimal participants."); *United States v. Carter*, 971 F.2d 597, 600 (10th Cir. 1992) (discussing indispensable role couriers play); *see also United States v. Montoya*, 24 F.3d 1248, 1249 (10th Cir. 1994) (collecting cases). Even if Castaneda was involved in the conspiracy solely as a courier, there was sufficient evidence to support the district court's conclusion that he was not a minor or minimal participant, especially in light of the distance traveled and the quantity of cocaine found in the vehicle. The district court therefore did not err in denying Castaneda a downward adjustment under § 3B1.2.

**B. Criminal History Category**

Finally, Castaneda argues that due to numerous substance abuse related convictions, his criminal history exaggerated his past criminal conduct and his need to be punished and that the district court therefore should have departed downward in sentencing him. This court lacks jurisdiction to review a district court's discretionary decision not to depart downward absent evidence that the district court erroneously believed it lacked authority to depart. *See United States v. Belt*, 89 F.3d 710, 714-15 (10th Cir. 1996). "'[U]nless the judge's language unambiguously states that the judge does not believe he has authority to downward depart, we will not review his decision.'" *Id.* (alteration in original) (quoting *United States v. Rodriguez*, 30 F.3d 1318, 1319 (10th Cir. 1994). There is no evidence that the district court did not believe it had discretion to depart downward in this case; we therefore do not have jurisdiction to review Castaneda's claim.

## CONCLUSION

The judgment of the United States District Court for the District of New Mexico is **AFFIRMED**.

Entered for the Court,

Michael R. Murphy
Circuit Judge